```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| KRASNYI OKTYABR, INC.,<br><br>         Plaintiff,<br><br>    -v-<br><br>MAERSK A/S,<br><br>         Defendant. | 24-cv-5332 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

On February 28, 2025, the Court issued a bottom-line order in the above-captioned case. See ECF No. 26. That order granted the motion of defendant Maersk A/S ("Maersk") for summary judgment. This Opinion and Order explains the reasons for the Court's decision and directs the entry of final judgment.

I.   **Background**

This case is about a shipment of Russian sweets that went sour. Plaintiff Krasnyi Oktyabr, Inc. ("Krasnyi Oktyabr") sues defendant Maersk under the Court's admiralty jurisdiction. The complaint includes four causes of action: (1) violation of the Carriage of Goods by Sea Act; (2) common-law breach of contract; (3) negligence; and (4) action on return of freight. Compl. at 3-6.

More particularly, Krasnyi Oktyabr alleges that Maersk never delivered eight shipments that it accepted in Riga, Latvia, and agreed to transport to Newark, New Jersey in Fall 2023. Id. ¶ 4; see also Pl.'s Counterstatement of Fact at ¶¶ 29-36. Seven of the shipments never reached Newark, and customs authorities at the Port of Newark

1

did not release the eighth shipment. Compl. ¶ 8. According to Krasnyi Oktyabr, Maersk's failure to deliver was especially detrimental to its business because the shipments consisted of "chocolate and other confectionary items" that were scheduled to arrive in time for the "December holiday market." Id. ¶¶ 5, 10.

Following discovery, Maersk now moves for summary judgment. See ECF No. 17. Central to its motion is the "Maersk policy on Russia," which was initially developed in Spring 2022 in response to Russia's invasion of Ukraine. See Def. Mem. of Law at 5-8, 18-23. Maersk points out that the booking confirmations and bills of lading for the subject shipments all reference Maersk's so-called Russia policy. See id. at 2-5. Specifically, those documents include web addresses that direct a reader either to the homepage of Maersk's website or to a more specific page with the heading "Advisories: Russia / Ukraine update." See id.; see also ECF No. 18-6 at 2. Maersk argues that its "policy regarding Russia is accessible and incorporated on its website via the links provided on the face of the respective Booking Confirmations and Waybills." Def. Mem. of Law at 6. Relevant here, the website stated that Maersk would "not accept any bookings for transport services where the ultimate origin . . . of cargo is Russia." See id. at 9 (emphases added). Maersk claims that Krasnyi Oktyabr was in breach of Maersk's policy because the disputed cargo originated in Russia and that it was thus entitled under the booking confirmations and bills of lading to return the shipments to Latvia. See Def. Mem. of Law at 20-23.

2

Krasnyi Oktyabr admits many of the factual assertions underlying Maersk's motion. For example, it does not dispute that the cargo was Russian in origin and that the intermediaries who arranged for the goods to be moved from Russia to Latvia and then to be shipped to New Jersey were acting on Krasnyi Oktyabr's behalf.[1] Pl.'s Counterstatement of Fact at ¶¶ 4, 5, 16-17, 28. Nor does Krasnyi Oktyabr dispute that the booking confirmations and bills of lading reference some form of Maersk's policy on Russia. Id. at 7-11. Instead, Krasnyi Oktyabr's opposition to the instant motion -- and thus the remainder of this Opinion -- centers on whether Maersk's so-called policy on Russia was integrated into the parties' shipping agreements as expressed in the booking confirmations and bills of lading.

Starting with the booking confirmations, six of the eight shipments[2] include the same language:

> <u>This booking confirmation is subject to compliance with Maersk policy on shipments from Russia and Belarus (available on Maersk.com)</u> and UN, EU and US sanctions and export control laws, including US and EU sanctions laws applicable to Russia and Belarus. By proceeding, <u>the Shipper represents that this booking is in no way violating Maersks policy on shipments from Russia and Belarus</u>, that the shipment does not involve, nor shall it involve, in either context directly or indirectly, in any way any entity or person subject to sanctions, including any entity or person subject to sanctions relating to Russia and/or Belarus and that this booking does not include any items prohibited by sanctions for exports from Russia and/or Belarus. <u>If this shipment is in violation of Maersks policy on Russia and Belarus,</u> any

---

[1] Krasnyi Oktyabr had contracted with a Russian-based company to deliver the goods from Russia to Latvia and with another company to serve as the shipper of the goods.

[2] These shipments bear booking numbers 231468270, 231680848, 231767530, 231768760, 231078593, and 231440638.

3

> entity or person involved in this booking is an entity or person subject to sanctions or any items in this booking are prohibited for export from Russia and/or Belarus by sanctions, <u>the shipment will be returned to the origin without exception, and the shipper will be responsible for all cost and risk for such return.</u> The Shipper agrees that the Carrier may withhold release of cargo pending investigation to determine if the booking is in violation of sanctions.

ECF No. 18-3 at 5-16, 23-25, 29-34 (emphases added). The booking confirmations for the other two shipments[3] are slightly different:

> The Merchant(s) warrant and represent that this shipment and/or Goods will comply at all times with European Union, United States and United Nations sanctions and export control laws (Sanctions Laws), and that this shipment and/or Goods does not involve, whether directly or indirectly, any entity or person identified, or owned or controlled by any such entity or person identified, on the U.S. Treasury Departments Office of Foreign Asset Control (OFAC) list of Specially Designated Nationals and Blocked Persons, or any other similar list maintained by the European Union, or as promulgated by the United Nations Security Council (Designated Person). Without limiting the foregoing in any way whatsoever, <u>the Merchant(s) warrant and represent that this shipment and/or Goods in no way violates the Carriers policy on shipments involving, but not limited to, Russia, which can be found at [https://www.maersk.com/news/articles/2022/02/24/russia-ukraine-siutation-update]</u> and that the shipment and/or Goods do not involve any products that incorporate Russian origin steel or iron inputs, whether or not the shipment and/or Goods are processed and/or transshipped in any third country. <u>If, in the Carriers reasonable opinion, this shipment and/or Goods are in violation of the Carriers policy on Russia, Sanctions Laws or involves any Designated Person, the shipment will be returned to the origin at the Carriers sole and unfettered discretion, and the Merchant(s) shall indemnify and hold harmless the Carrier, its servants and agents, for any breach of this clause.</u> The Merchant(s) agree that the Carrier may stop the shipment and/or Goods in transit or withhold release of shipment and/or Goods pending any investigation into compliance with this clause by the Merchant(s).

---

[3] These shipments bear booking numbers 232299044 and 232164417.

<u>Id.</u> at 2-4, 17-19 (emphases added).

The bills of lading -- which reference Maersk's policy on Russia -- also come in two forms. Five of the bills of lading[4] provide:

> <u>This shipment is subject to compliance with Maersk policy on shipments from Russia and Belarus (available on Maersk.com)</u> and UN, EU and US sanctions and export control laws, including US and EU sanctions laws applicable to Russia and Belarus. <u>By proceeding, the Shipper represents that this booking is in no way violating Maersk's policy on shipments from Russia and Belarus</u>, that the shipment does not involve, nor shall it involve, in either context directly or indirectly, in any way any entity or person subject to sanctions, including any entity or person subject to sanctions relating to Russia and/or Belarus and that this booking does not include any items prohibited by sanctions for exports from Russia and/or Belarus. <u>If this shipment is in violation of Maersk's policy on Russia and Belarus,</u> any entity or person involved in this booking is an entity or person subject to sanctions or any items in this booking are prohibited for export from Russia and/or Belarus by sanctions, <u>the shipment will be returned to the origin without exception, and the shipper will be responsible for all cost and risk for such return.</u> The Shipper agrees that the Carrier may withhold release of cargo pending investigation to determine if the booking is in violation of sanctions.

ECF No. 18-4 at 6-9, 12-17 (emphases added). The three other bills of lading[5] state:

> The Merchant(s) warrant and represent that this shipment and/or Goods will comply at all times with European Union, United States and United Nations sanctions and/or export control laws (Sanctions Laws), and that this shipment and/or Goods do not involve, whether directly or indirectly, any entity or person identified, or owned or controlled by any such entity or person identified, on the U.S. Treasury Departments Office of Foreign Asset Control (OFAC) list of Specially Designated Nationals and Blocked Persons, or any other similar list maintained by the European Union, or as

---

[4] These shipments bear the numbers MAEU231680848, MAEU231468270, MAEU231078593, MAEU231440638, and MAEU231768760.

[5] These shipments bear the numbers MAEU231767530, MAEU232164417, and MAEU232299044.

>   promulgated by the United Nations Security Council
>   (Designated Person). <u>If, in the Carriers reasonable opinion,
>   this shipment and/or Goods are in violation of the Carriers
>   policy on Russia [https://www.maersk.com/news/articles/
>   2022/02/24/russia-ukraine-situation update]</u>, Sanctions Laws
>   or involves any Designated Person, <u>the shipment and/or Goods
>   will be returned to the origin at Carriers sole and unfettered
>   discretion, and the Merchant(s) shall indemnify and hold
>   harmless the Carrier, its servants and agents, for any breach
>   of this clause.</u> The Merchant(s) agree that the Carrier may
>   stop the Cargo in transit or withhold release of Cargo pending
>   any investigation into compliance with this clause by the
>   Merchant(s).

<u>Id.</u> at 2-5, 10-11 (emphases added).

## II. Legal Standard

Rule 56(a) requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." <u>Aetna Life Ins. Co. v. Big Y Foods, Inc.</u>, 52 F.4th 66, 72 (2d Cir. 2022).[6] To successfully oppose summary judgment, plaintiffs must "present competent evidence that creates a genuine issue of material fact" and not "merely deny the moving party's allegations in a general way." <u>McKinney v. City of Middletown</u>, 49 F.4th 730, 738 (2d Cir. 2022).

"The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court

---

[6] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

must be able to find[,] after drawing all reasonable inferences in favor of a non-movant[,] that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016). "[T]he district court's function is not to weigh the evidence or resolve issues of fact." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002). Instead, the district court's role is "confined to deciding whether a rational juror could find in favor of the non-moving party." Id.

III. **Analysis**

To counter Maersk's motion, which, as just explained, relies on Maersk's Russia policy, Krasnyi Oktyabr focuses the Court's attention on a narrow question: Did Maersk identify its policy on Russia with sufficient clarity for the policy's terms to be incorporated by reference into the parties' agreements? Krasnyi Oktyabr argues in the negative, insisting that the Maersk policy "was not readily available to the [p]laintiff" and thus "[t]he [p]laintiff and its agents could not bind themselves to conditions that they did not know about at the time of booking the cargo." Pl. Opp'n at 18. It emphasizes that Maersk's "policy" was spread across multiple webpages and buried in 14 "Updates" and 30 "FAQs." See id. at 10-14, 21-22. For this reason, Krasnyi Oktyabr asserts that the "booking confirmations and bills of lading d[o] not make clear reference to Maersk's 'Russian policy' in such terms that the identity of the policy may be ascertained beyond doubt." Id. at 21-22.

7

Incorporation by reference is a common feature of contracts and a drafting practice familiar to courts. This observation holds true in the complex area of admiralty law. See New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 30 (2d Cir. 1997) ("We recognize that maritime contracts may validly incorporate by reference terms from other documents or agreements."). Whether evaluating a basic services contract or a highly technical maritime agreement, the general principles that guide a court's determination of whether extrinsic material is incorporated into a contract remain the same: The contract must "make[] clear reference to the document," and "describe[] it in such terms that its identity may be ascertained beyond doubt." 11 Williston on Contracts § 30:25 (4th ed. 2024) (hereinafter "Williston"); see also New Moon, 121 F.3d at 30. These requirements ensure "that the parties to the agreement had knowledge of and assented to the incorporated terms." 11 Williston § 30:25.

Two other legal principles are relevant to the Court's analysis in this case. First, "[i]ncorporation by reference is a matter of law that can be resolved on summary judgment and does not require a trial to discard a contrary interpretation urged by one party."[7] Pagaduan v. Carnival Corp., 709 F. App'x 713, 715-16 (2d Cir. 2017) (citing Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,

---

[7] Plaintiff accepts in its opposition brief that "[w]hether a document is incorporated by reference is a matter of law," and proceeds on an understanding that the question presented by the parties is for determination by the Court and not by a jury. Pl. Opp'n at 17 (citation omitted).

8

991 F.2d 42, 47 & n.8 (2d Cir. 1993) & Roling v. E*Trade Sec. LLC, 860 F. Supp. 2d 1035, 1041 (N.D. Cal. 2012)). Second, "[t]o determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." Miller v. Mercuria Energy Trading, Inc., 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018) (citing Progressive Cas., 991 F.2d at 47).

Under this framework, the precise content of the parties' agreements is critical to determining whether Krasnyi Oktyabr is bound by Maersk's Russia policy. While the contractual provisions are lengthy, see supra at pp. 3-6, the Court finds three features of these agreements relevant to this case. First, the agreements identify the existence of a policy developed by Maersk related to its operations in Russia. Second, they state that a merchant's violation of that policy permits Maersk to return the shipments to their origin. Third, they direct a reader to Maersk's website (via two different web addresses, one to Maersk's homepage and another to a "Russia / Ukraine update" page) to review the Russia policy.[8] These observations, in turn, support an equally clear conclusion: If Maersk's policy on Russia

---

[8] In the "Preliminary Statement" of its opposition brief, Krasnyi Oktyabr states that "the terms and conditions for the bills of lading do not mention anything about Maersk's sanctions policy." Id. at 5. Krasnyi Oktyabr never develops that argument further or explains its legal relevance. But even assuming that the argument is not forfeited, it is a non-sequitur. The bills of lading clearly cite to a policy on Russia. See supra at pp. 5-6. Krasnyi Oktyabr identifies no authority that would have required Maersk to include its policy in the terms and conditions rather than incorporate the policy by reference on the face of the bills of lading.

is incorporated into the parties' contracts, then Maersk acted within its contractual rights by returning Krasnyi Oktaybr's goods to Latvia. Therefore, the key question -- and focus of Krasnyi Oktyabr's briefing -- is whether the Russia policy can be "ascertained beyond doubt" and is thus incorporated by reference in the parties' agreements.

Contrary to Krasnyi Oktyabr's position, the Court is not persuaded that Maersk's website required a user to navigate an "obstacle course" to locate its policy on Russia. Pl. Opp'n at 18. While Krasnyi Oktyabr contends that the Maersk homepage, which is the web address included on six of the booking confirmations and five of the bills of lading, includes neither the "Updates" nor "FAQs" that Maersk argues constitutes its Russia policy (which were located on the "Russia / Ukraine update" page, described in further detail below), it provides no screenshots or other competent evidence to support its factual assertion.[9] Even so, accepting Krasnyi Oktyabr's position on the Maersk homepage -- viz., that the "Updates" and "FAQs" were not directly posted on that site -- does not, without more evidence, necessitate the conclusion that those specific pages were difficult to access from Maersk's homepage. Moreover, it would defy common sense

---

[9] Krasnyi Oktyabr cites only the deposition testimony of Barbara Suarez, a regional claims manager at Maersk, to support this proposition. Pl. Opp'n at 10. But, putting aside that Krasnyi Oktyabr has not offered any evidence of the appearance of Maersk's homepage, Suarez's testimony, at most, indicates that it was "a two or three step process" to access the "Updates" and "FAQs." See ECF No. 18-2 at 17-18. At no point did she indicate that this content was not accessible from the homepage, and Krasnyi Oktyabr has not provided any evidence from which a jury could conclude that the "two or three step process" was difficult to navigate.

to conclude that Krasnyi Oktyabr could not find the "Russia / Ukraine update" page from Maersk's homepage when it, as a matter of fact, had the precise web address for that page in contemporaneous agreements related to the same transaction.

While it is true that the "Russia / Ukraine update" page consists of 14 "Updates" and 30 "FAQs," they are all short, straightforward, and user-friendly. See ECF No. 18-6, ECF No. 18-8. The "Updates" are marked by a header "Previous Updates," and all appear under a drop-down menu for a "List of updates." ECF No. 18-6 at 3. Likewise, several "FAQs" appear under the header "Frequently asked questions"; a conspicuous box is labeled "More FAQs," which -- when clicked -- directs a user to three pages of short "FAQs" detailing the application of Maersk's policy to specific circumstances. See id.; ECF No. 18-8; ECF No. 22-1. A reasonable person (let alone a sophisticated business entity that is impacted by evolving international events) would have no trouble locating Maersk's "Russia / Ukraine update" page and thereafter clicking through the "Updates" and "FAQs" to find the most relevant selections.

If Krasnyi Oktyabr had reviewed this page,[10] it would have realized that the application of Maersk's Russia policy to its own shipments was clearcut. For example, "Update 9," issued on March 3,

---

[10] Of course, it is a foundational principle of contracts that parties read the agreements they sign. See 27 Williston on Contracts § 70:114 (4th ed. 2024) (hereinafter "Williston") ("One who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.").

2022 (over a year before the events giving rise to this litigation), states: "Earlier this week we communicated that until further notice, all new Maersk bookings within ocean, air and intercontinental rail to/from Russia would be suspended due to direct and indirect sanctions and that exempted from this booking suspension was foodstuffs, medical and humanitarian supplies." ECF No. 18-6 at 6. The Update then explained that the "food" exemption would no longer apply. See id. Similarly, "Update 12" explained that "[e]arlier we have communicated A.P. Moller - Maersk would cease all our operations in Russia and Belarus." Id. at 4.

The "FAQs" resolve any ambiguity about whether the policy applied to goods originating in Russia but not collected by Maersk in Russia. One "FAQ" asks: "Can I ship/transport cargo from or to neighbouring countries of Russia that originates from Russia or is going to Russia?" Answer: "No. Maersk is not providing any transport services to or from Russia. In addition, Maersk will not accept any bookings for transport services where the ultimate origin or destination of cargo is Russia." ECF No. 18-8 at 11. Thus, if presented with the booking confirmations and bills of lading, a reasonable person would conclude that Maersk's policy on Russia -- accessible via the provided web addresses and captured by the "Updates" and "FAQs" on the "Russia / Ukraine update" page -- was incorporated into the agreements and clearly barred the shipment of Krasnyi Oktyabr's goods.

To be sure, as Krasnyi Oktyabr repeatedly suggests, Maersk could have "just state[d] the alleged policy right on the bill of lading."

12

Pl. Opp'n at 17-18. But Krasnyi Oktyabr cites no case to support the proposition that Maersk was required to choose this option. Moreover, the argument proves too much -- taken seriously, Krasnyi Oktyabr's rule would mean that parties could almost <u>never</u> incorporate extrinsic materials and conditions by reference. To the contrary, courts in this circuit have recognized that a contract can incorporate the contents of a webpage by referencing a web address. <u>See, e.g.</u>, <u>A.P. Moller-Maersk A/S v. Ocean Express Miami</u>, 590 F. Supp. 2d 526, 531 (S.D.N.Y. 2008) (finding that a bill of lading that was available on the Internet but not sent directly to defendants was incorporated by reference). And the cases that Krasnyi Oktyabr <u>does</u> cite are inapposite because they involve consumer click-wrap agreements, which present different issues than does an agreement between two sophisticated corporate entities.[11] <u>See, e.g.</u>, <u>Applebaum v. Lyft, Inc.</u>, 263 F. Supp. 3d 454, 465-69 (S.D.N.Y. 2017) (involving online agreement that plaintiff argued he did not assent to because he was not on inquiry notice of the hyperlinked contract's terms).

Krasnyi Oktyabr's final arguments fail. To start, it argues that even if the "Updates" and "FAQs" are incorporated into the agreements,

---

[11] Krasnyi Oktyabr suggests that the agreements in this case were "contracts of adhesion." Williston on Contracts favorably cites several decisions defining a "contract of adhesion" as a standard-form contract offered by a party with superior bargaining power to a party of weaker bargaining power. 8 Williston § 18:8. Here, unlike in the context of a click-wrap agreement or other contract of adhesion, it is not clear why the parties, both corporate entities, have unequal bargaining power. <u>See generally</u> Todd D. Rakoff, <u>Contracts of Adhesion: An Essay in Reconstruction</u>, 96 Harv. L. Rev. 1173 (1983).

13

Maersk's policy on Russia "did not preclude the shipment of Russian-made goods." Pl. Opp'n at 22. But, as explained above, the "FAQs" clearly reject this claim: "Maersk will not accept any bookings for transport services where the ultimate origin or destination of cargo is Russia." ECF No. 18-8 at 11.

Krasnyi Oktyabr also argues that Maersk accepted and delivered Krasnyi Oktyabr's goods, but did not invoke the Russia policy, on several prior occasions. Krasnyi Oktyabr thus contends that it had no reason to "be on alert for sanctions when it had not been an issue for a considerable amount of time." Pl. Opp'n at 23. Krasnyi Oktyabr does not explain the legal significance of its factual assertion. More specifically, it does not explain why Maersk's failure to detect a contractual breach for prior shipments would prevent it from enforcing the policy for offending goods that it did discover. While custom between parties can inform a Court's interpretation of a contract, Krasnyi Oktyabr cites no affirmative evidence suggesting that Maersk had indicated that Krasnyi Oktyabr was exempt from its policy. And, of course, if Krasnyi Oktyabr was confused about whether the policy on Russia would apply to its shipment, it could have consulted Maersk.

For the foregoing reasons, the Court concludes that Maersk's policy on Russia was incorporated by reference into the booking confirmations and bills of lading governing the parties' shipping agreement and that the policy itself permitted Maersk to return, at Krasnyi Oktyabr's cost, any shipments containing goods that had originated in Russia. Further, Krasnyi Oktyabr does not dispute that

14

the shipments in this case contained goods that had originated in Russia. Accordingly, Krasnyi Oktyabr's four claims -- each of which presents a different legal theory but ultimately alleges, in some form, that Maersk acted unlawfully by failing to deliver its shipments to their ultimate destination -- fail as a matter of law. For the foregoing reasons, the Court grants the motion of defendant Maersk for summary judgment, dismissing all claims with prejudice, and directs the Clerk of Court to enter final judgment.

    SO ORDERED.

New York, NY  
March 31, 2025

                                               JED S. RAKOFF, U.S.D.J.